Ms. Smith is here for Ernesteen Jones. Mr. Klein for Novartis. Ms. Smith, you may begin. May it please the court. I'm Tammy Smith for the appellant Ernesteen Jones. In this case, the district court abused its discretion by an all-out exclusion of all of plaintiff's causation experts by ignoring facts and evidence that supported each of the opinions. The first expert is Dr. Banks Henshaw. He's a gynecologist specializing in the treatment of osteoporosis for women who are post-menopausal. The court... Do you want to point to a study that establishes a causal relationship between reclass and atypical femur factors? Well, yes, sir, we are. What the court misunderstood is that she narrowly focused on the fact that there's not a case that basically in the title says reclass causes atypical femur fractures. It's not surprising that there's not a case that does that because since 1995 reclass has... My question is with regard to all of these experts, nobody is able to point to any peer-reviewed literature that establishes any connection between reclass and atypical femur fractures. No, sir, that is not true. What is true is that there is not a study that singles out reclass and says reclass causes it. That's because there's over 300 studies. A majority of the studies look at... all of them look at bisphosphonates as a class. That's because the mechanism of action is the same. Reclass is a bisphosphonate. Reclass was late to the market. It wasn't on the market till 2007. Bisphosphonates have been in the market since 1995. What's the study? Well, there are several different studies that mention different clinical data from the reclass trials, the Horizon FIT trial. If you look at the second ASBMR Task Force report, which is document 117-1, that is from 2014. It goes into the clinical data from the reclass trials. And in that paper, they indicate that there is evidence for an association between bisphosphonates and atypical femur fractures. They use the clinical data from the reclass trials regarding atypical femur fractures. And as this court is aware, the epidemiological studies are the best evidence, and that's what the ASBMR is relying on. Did Dr. Henshaw say he read that ASBMR Task Force report? Yes, sir. Yes, sir. He's intimately familiar with all three of the ASBMR Task Force reports. What about Dr. Wortham? He never read the report, right? Dr. Wortham was aware of the, there are minor and major features that when you're, these atypical femur fractures are very specific. The ASBMR came up with the definition for an atypical femur fracture in the context of people taking bisphosphonates. It's not just a regular femur fracture, and they have, there are major and minor characteristics. I don't believe, I believe what Dr. Wortham testified to was that he had never read the full paper, but he was intimately familiar with what the major characteristics were, which would require him to do that analysis to diagnose her. And he did do that analysis. And I can go through those. Yes, sir. Yes, sir. Yes, sir. Dr. Wortham, the treating physician. She did. She ignored some of his testimony. His testimony was that when someone comes in with a femur fracture that they he looks for different causes, such as does it has that person had cancer? Could it be a rebreak and also other other medications that that person could take? Which steroids is one of them. Miss Jones had been on steroids and he he did a differential diagnosis and said that the steroids could not be the cause. And he gave several reasons, one of which was where it was on her diaphysis is not where a steroid induced fracture would typically be on an osteoporotic patient. He also said there were thickening of the cortices on the X-ray, which is one of the specific features that the ASBMR has indicated is for an atypical femur fracture caused by bisphosphonates. And then he also said that the steroid association with the typical osteoporotic fractures, the osteoporotic fractures would happen in different different places. They would happen at the condylar, at the at the hip and that kind of thing. They would not happen to the subtracanteric region, which is the hardest part of the femur, which is where these ASBMR says these atypical femur fractures happen. Can I ask you to go back? I'm sorry. I know you're going from the general to the specific. That's OK. But I want to take you back to the general a second. Yes, sir. On the general causation issue, you said there were many studies. I think you said hundreds of studies dealing with BP's in general. The best of those studies in terms of cause general causation say what about BP's and atypical femur fractures? They say that there is evidence that there is an association between bisphosphonates and atypical femur fractures. It's important to understand, too, in these studies that the ASBMR, the ASBMR formed a task force with regards to these specific fractures. And I think what's important in this case is that it's not just some injury that, you know, for example, if a drug could cause you to have a stroke or if a drug could cause you to have cancer or something like that. These atypical femur fractures have been introduced within the context of bisphosphonates, these ladies taking bisphosphonates for osteoporosis. So again, I just want to make sure I've got that general part right. Those studies, the most they can tell us, and of course the experts can go from there, is that there is an association. Not a cause AFM. That's right. And that is all that is required for Dr. Henshaw to give a general causation opinion with regards to his Bradford Hill analysis. Before he does his Bradford Hill analysis, which the court accepted as reliable methodology, he must point to evidence of an association. What Judge Hopkins ignored was vast evidence. Who's doctor was that? Dr. Henshaw. Dr. Henshaw is our general causation expert. He did the Bradford Hill analysis, which is accepted in many circuits, and Judge Hopkins accepted it. Before you do that analysis, you must point to evidence of an association, not causation. And there is ample evidence of association that she ignored, primarily with all the 300 studies that we've cited, but also with regards to the ASBMR and the particular ASBMR task force reports that are dealing with these atypical femur fractures. She found that, oddly, the district court found that Banks Henshaw, who is our general causation expert, analyzed all nine of the Bradford Hill factors, and five of the Bradford Hill factors have to do with the analysis regarding an association. So, by requiring him to point to a study that says specifically in the title, reclassed causes atypical femur fractures, she abused her discretion. The other argument that Novartis makes is that it was not appropriate for him to extrapolate from other studies, and they cite the Rider case. Rider is an 11th Circuit case where this court rightfully found that extrapolation from a class to a specific drug was inappropriate. In that case, though, which is very different from this case, Parlodil was the drug. There was evidence that Parlodil caused an ischemic stroke, which is due to not enough blood to the brain, and the leap that the experts were trying to make that the court would not allow them to make, which they shouldn't, was that if one drug in the ergot algaloid class causes ischemic strokes, then Parlodil caused a hemorrhagic stroke. Well, that is the exact opposite injury. That is not what we have here. We're talking about the exact injury that only happens in these bisphosphonate cases. There was also no theory of the mechanism of action in Rider. This case is more like the SSRI cases where courts have allowed extrapolation, where there is a general association to be extrapolated to show specific causation. In those cases, it was drugs that caused suicidal tendencies for depression, and they were allowed to extrapolate because the medical and scientific communities treated them as a class. The FDA issued a class-wide warning, which the FDA issued in this case, and it's on the Reclass label, and Novartis has accepted it on the Reclass label. It says Reclass can cause unusual thigh bone fractures. So we would suggest that the district court impermissibly ignored the label as well as evidence. If there are no more questions, if I could reserve five minutes for rebuttal. Thank you, Your Honor. May it please the Court, Stephen Klein for Appley. I want to begin with a standard. We all know it's a deferential standard here. Abuse of discretion, manifest error. Judge Hopkins did not ignore the studies in the literature regarding oral bisphosphonates and atypical femur fractures. In fact, she spends a lot of time, in her opinion, taking that issue on squarely, because that is the methodology that Dr. Hinshaw claimed he used, looking at the oral bisphosphonate studies and extrapolating from those to Reclass. So it's not true that she ignored it. The question here is not whether the district court was right or wrong. This panel respectfully is not to substitute its judgment for the trial court's judgment. It's a deferential standard of review. It's whether the trial court acted within its considerable discretion, examining the evidence, looking at the extensive record and coming to a decision. What the record shows, and what's really at the bottom of this case, is that Reclass stands apart within the class of bisphosphonates approved for premenopausal osteoporosis. All of the other bisphosphonates in that class are orally given. They're pills. They're given daily, weekly, or monthly. They obviously are ingested through the digestive system. Reclass, in contrast, is the only intravenously administered bisphosphonate in this class, and it's given once a year. In some cases, once every other year. It's not given daily. It's not given weekly. It's not given monthly. And what that means is that the serum level of the bisphosphonate is not constantly being replenished throughout the year. And this can have very significant impacts on the material properties of bone. And in fact, that's what Dr. Hinshaw himself has acknowledged. And the trial court relied on the actual words and testimony of Dr. Hinshaw and Ms. Jones's other experts themselves. We look at Dr. Hinshaw's testimony, and we find that he says there is an association between reclass and atypical femur fractures. Why didn't the district court abuse his discretion? He doesn't have to say or cite specific literature to demonstrate that there is, that it causes femur fractures. Well, he can't rely on his simple ipsy-dixit. There has to be... He can't say that there's association based on the literature that I've reviewed? Well, he can't say that if it doesn't, if the science doesn't support it. And the district court is entitled to go behind his ipsy-dixit and look at the actual literature. The district court says he doesn't say there's causation. But if he doesn't have to say there's causation, all he has to say is there's an association. Doesn't the district court abuse his discretion? No, Your Honor, because that's exactly what the district court did say. The district court acknowledged that the first step of Bradford Hill is not a causal association, not causation, but simply an established association. And, in fact, that's the whole purpose of the Bradford Hill analysis, which is... If the literature establishes that there is an association and the expert is able to rule out other causes, then the expert's opinion ought to be admitted if he's qualified and it's helpful to the jury. If there is science to support his assertion that there's an association, which is a prerequisite for the Bradford Hill analysis to establish general causation, and then if the specific causation expert is able to sufficiently rule out, using a reliable methodology, other causes, then, yes, that is an admissible causation opinion. That is not what we have here, both at the general causation stage and at the specific causation stage. But, you know, a district judge is not supposed to use the Daubert gatekeeping function as a way to keep difficult expert issues from a jury. It's only supposed to be to weed out the stuff that's, you know, completely irrelevant or completely unjustified or completely theoretical or things like that. It seems to me there's a very small step. And, again, I'm certainly no medical expert and I haven't been able to dive 100% into the record. I've only read the reports. Isn't there a small, a relatively small step between saying that there is an association between the BPs and AFF and then saying Reclast is a form of BP, although, as you said, it's administered differently, different dosages at different times. But here are my reasons for thinking that that same association plays out and here's why I think there's general causation. What's missing from that analysis, Your Honor, is the fact that the literature that actually does separate out the different bisphosphonates has never found an association, statistically significant association, with Reclast. So we have a study called Edwards, and Dr. Hinshaw acknowledged this, which looked at the bisphosphonates individually and the vast majority of the data was related to the oral bisphosphonates, Fosamax in particular, found an increased odds ratio, a statistically significant result for Alendronate, Fosamax, but found no statistically significant result for Reclast and looked at them separately. We also have a study called Brock, 2015, and again, this is a study that Dr. Hinshaw acknowledged and the district court relied on this study and Dr. Hinshaw's concessions about it. This study looked at the impact of individual bisphosphonates on the material properties of bone, specifically the fatigue life of bone, which is thought to be one of the mechanisms for these atypical femur fractures. So it really cut to the heart of what this case is about. It looked at the individual bisphosphonates as they impact bone, and it found that with Alendronate, Fosamax, the oral bisphosphonate, there was a decreased loss of the fatigue life of bone, whereas for Reclast, there was none. It found no effect at all. And if I may, the ASBMR Task Force does not report any individual study finding an association between Reclast and atypical femur fractures. And Ms. Smith mentioned the Reclast clinical trial. Respectfully, the clinical trial found no increased association. It found three fractures that could potentially be considered atypical based on location in the treatment group, and it found two in the placebo group. So there was no statistically significant increased risk based on the clinical trial data at all. So what Brock, not only did Brock find that there was no impact on the fatigue life of bone from Reclast, whereas there was from the oral bisphosphonates, it explained the mechanism of why this might be the case. And if I could read briefly from Brock, differences in the administration of the bisphosphonates may contribute to the altered fatigue properties. With daily dosing of Alendronate, the bisphosphonate is present in the serum, continuously affecting biomarkers of bone turnover, whereas a single dose of Zalendronate, which is Reclast, may allow the serum biomarker levels to return to pretreatment homeostasis. So this court has recognized in Ryder and in McLean that even minor differences or deviations in the chemical structure of a drug can have major differences in the clinical impact of that drug. And in fact, it is the burden of the proponent of the evidence and the burden of Dr. Hinshaw to prove that those differences in chemical structure make no difference in Dr. Hinshaw's opinion. Not only did he fail to do that, he actually conceded the opposite. And this is what the district court in its discretion relied on. Dr. Hinshaw admitted in deposition that the process of how Reclast administered intravenously impacts bone is not likely to be parallel to the process of how the oral bisphosphonates impact bone. Those are his words. He acknowledged that the different route of administration and the different dosing regimen make a huge difference. Again, his word, huge difference. He acknowledged that it would be, therefore, invalid to extrapolate from the oral bisphosphonates. I mean, this is his own testimony. And this is what the district court relied on in its discretion. This is the record before the district court. Dr. Hinshaw admitted it would be invalid to extrapolate from the oral bisphosphonates because the route of administration and the different dosing regimen make a big difference, a huge difference. Yet that's the basis for his general causation opinion. So we think the record is absolutely clear that it's not legitimate to extrapolate, that it's Dr. Hinshaw's burden to establish that there's a scientific basis, a reliable scientific basis for him to do so. And he failed to do that. The district court issued a detailed 119-page memorandum opinion examining the record. The district court is closer to the record. She weighed the testimony of Dr. Hinshaw and Plano's other experts. She did not weigh credibility. That's not the proper role at this stage. She simply took their testimony at face value, using their own words, and determined that Dr. Hinshaw was not able to establish the reliability of his extrapolation from the oral bisphosphonates. Tell me about Dr. Worden. Is his exclusion dependent on the exclusion of Dr. Hinshaw? It is not. If Dr. Hinshaw's opinion is enough to get to a jury, what happens to Dr. Worden's opinion about specific causation? There are independent grounds to exclude Dr. Worden, which the court found, apart from the lack of general causation through Dr. Hinshaw's opinion. First, the court found that Dr. Worden was not qualified to opine on the cause of Ms. Jones's fracture. Dr. Worden was the emergency room physician who happened to be on call when Ms. Jones walked into the emergency room. He's an orthopedic surgeon. He's seen a lot of femur fractures. He did not testify that he had ever seen an atypical femur fracture in his career. He said he saw two or three fractures out of the thousands that he's treated where a patient had been on bisphosphonates. But he never said he treated any atypical femur fractures before Ms. Jones. Dr. Worden doesn't need to be a specific causation expert, does he? He's an orthopedic surgeon and treated her. Well, he may be qualified to repair her fracture. He may be qualified to diagnose it as an atypical femur fracture and there are specific diagnostic criteria. That's very different than being qualified to opine as to the cause. He does not study atypical femur fractures. He does not study bisphosphonates. He does not prescribe bisphosphonates. He's a surgeon. He sees a break. He repairs it. He never read the ASBMR paper, which is the seminal paper on the issue. But he did have some familiarity with some of the diagnostic criteria. And by the way, the ASBMR is very clear, as is FDA, as plaintiff has conceded, that causation has not been established. An atypical femur fracture does not mean it was caused by a bisphosphonate, even in a patient that has been on bisphosphonates. And it's acknowledged by all that atypical femur fractures occur in patients who have never taken bisphosphonates. It's acknowledged by all that there's a strong association between steroids and atypical femur fractures. And this is in the ASBMR paper itself. And that brings us to the second problem with Dr. Worthen's specific causation opinion, which is his differential. He was asked at deposition, and the court quoted this in her memorandum opinion, what is your basis for excluding steroids? And his only answer was, I thought it was an atypical femur fracture. So he looked at the criteria. He thought it met the definition. And that's the sole basis for his conclusion that it was caused by bisphosphonates. There's evidence in the record that steroids cause AFS? Yes, it's a statement. Not that they cause them, but that they are associated. How can you blame someone for not ruling out something which is not proven to be causal? Well, bisphosphonates have not proven to be causal. I know. But you're saying before he makes that decision, he's got to rule out that steroids are causal. But you're telling me that there's no evidence in the record saying that steroids are causal. There's just an association. So why are you supposed to rule the other one out if there's no evidence that it's causal? Well, he properly put steroids on his list. You rule in potential causes. So it's a potential cause. It's not established that it can cause it, but it hasn't been ruled out. Same thing with bisphosphonates. If it's not an established cause, even possibly, why do you have to rule it out? Well, I would take issue with the word even possibly. Science doesn't know. Can you tell me what the record says about steroids being causal or not? What the record says is that there's a strong association, but causation has not been established. And it's the same thing with the oral bisphosphonates. Correct. So it's appropriate for both steroids and bisphosphonates to be placed on the ruling in part of the differential. But for Dr. Worthen to rule— Do you understand that at some level this doesn't make any sense? In other words, you're saying the association part with BFFs and these atypical femur fractures is not enough to render a general causation opinion. And yet when it comes to ruling out another potential cause, you're saying something else which only has an associational relationship, not a causal one, that needs to get ruled out. Those things don't strike me as consistent. Well, we're treating steroids and bisphosphonates parallel when it comes to Dr. Worthen's opinion. If he's going to rule in bisphosphonates, even though causation has not been established, he's got to have some reliable basis for, in his opinion, ruling out steroids. And he does not have that. He simply assumed that because he thought the fracture met the definition of an atypical femur fracture, therefore he assumed, okay, it's caused by bisphosphonates. He could have come to the same conclusion with regard to steroids. When you do that sort of analysis, a doctor is not required to rule out every other possible cause, right? The doctor is required to rule out the other major reasonable— Major according to whom? According to the doctor based on scientific support. And did he admit that he had to rule out steroids? He did, and he purported to do it simply based on his assumption that if it's an atypical femur fracture, that means it's caused by bisphosphonates. So you're saying he didn't do it? Well, he claims he considered steroids and rejected them. So the court appropriately looked into his basis, his methodology for excluding steroids, and that's where he fell short. Because he had no basis other than the assumption, the circular reasoning, that if it's an atypical femur fracture, in my opinion, that's my basis for concluding that it was caused by bisphosphonates. Even though it's in the record that patients who have never taken bisphosphonates will experience atypical femur fractures, and even though it's in the record that there is a strong association between steroids and bisphosphonates. All right, thank you. Let's reserve some time for remarks. Thank you. Thank you. I'd like to start with Dr. Worthen. He did consider steroids. He did a proper differential diagnosis. He ruled out steroids by saying that there was a thickening of the cortices, which that is not present in steroid-induced fractures. It is only present in atypical femur fractures, which are caused by bisphosphonate use. And I will say, too, that one of the important factors of Dr. Worthen's differential diagnosis is that Ms. Jones' right leg completely broke, and he had to nail it. He properly nailed it back together. She presented with pain in her left leg that was just like the pain in her right leg. Dr. Worthen had read about bisphosphonates and had known that in 20% of people who experience an atypical femur fracture, they are going to experience an atypical femur fracture in the corresponding leg. He prophylactically nailed her left femur back together. So I guess my point is that the second differential diagnosis solidified his first differential diagnosis, which said that it was caused by atypical femur fractures. Why did he rule out steroids? He ruled out steroids because these atypical femur fractures happen in a very specific part of your femur. It's the subtracanceric part of your femur, which is not where steroid-induced fractures occur in the body naturally. And he explained that. The district court totally ignored his deposition testimony where he carefully goes through and says why he did not diagnose it as a steroid-induced fracture. And I will say, I think it's telling that I agree with Mr. Klein that he is qualified to diagnose this as an atypical femur fracture. Dr. Worthen is definitely qualified and did have familiarity with the diagnosis criteria. And if you look at the diagnosis criteria in the ASBMR, it is very specific. And he, if you look at his deposition testimony, he went down the line and gave nine of the major, well, there's major features and minor features, but nine of the features from the ASBMR, he did that properly and found them to all be met. So this is not like the Harvey case where the district court found that the doctor assumed the bisphosphonates caused another injury, osteonecrosis of the jaw. He testified that he assumed. There's no assumption with Dr. Worthen. He didn't assume anything. He carefully went through not only on the first diagnosis, but on the second diagnosis to qualify these as atypical femur fractures and to tell Ms. Jones to quit taking bisphosphonates. I'd like to address, too, something that Mr. Klein said. The standard of review is abuse of discretion. We have candidly acknowledged the standard of review from the very beginning in all of our briefs. This is a situation where the court needs to be reversed when there is so much evidence that has been absolutely ignored and that has resulted in a summary judgment. And as you know, this circuit, since 2010, has reversed six other district courts where they improperly abuse their discretion and kick all of plaintiff's experts so that there is no causation opinion. So we would strongly suggest that this is a situation where that is appropriate. If you were able to convince us that the exclusion of Dr. Worthen was wrong under an abuse of discretion standard, you still need at least one of the other experts to get to a jury, right? Yes, sir. We need Dr. Henshaw. And with regards to Dr. Henshaw and with a question that Judge Wilson had posed to Mr. Klein, you asked what the ASBMR says about the small step between going from bisphosphonates to reclass. The document number 107-29 is the most recent task force report of the ASBMR. And everybody agrees that the ASBMR is the preeminent authority, and they have been tasked with the job of trying to figure out what the relationship is between atypical femur fractures and all bisphosphonates, including reclass. Their most recent report in 2016 suggests, or not suggests, it finds that the risk of atypical femur fracture clearly increases with BP therapy duration. And the whole point of this paper was to—and they point out that they don't just look at the oral bisphosphonates. They also look at reclass, which is the injectable, and they suggest that after five years of oral BP use that the doctor should consider taking a break because the risk might outweigh the benefit at that point. And with the intravenous one, which is the one that we're here about today, they consider taking a break after three years. So I would suggest—I'm no doctor, but I would suggest that that means that the ASBMR is recognizing that reclass is stronger than the oral bisphosphonates, and therefore you need to take a break after three years instead of five because the risk of atypical femur fractures is outweighed in some patients. Not in all, but in some. So respectfully, I would say that the ASBMR has solidly looked at not just oral bisphosphonates and reclass, and I would suggest that Mr. Klein's cherry-picking of the Brock and Edwards articles out of over 300 articles does not give a clear picture. All right. Thank you. That's enough. Mr. Klein, the board is in recess until 9 o'clock tomorrow morning.